**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

     *Plaintiffs*,

v.

RON DESANTIS, in his official capacity as
Governor of Florida; MARK GLASS, in his
official capacity as Florida Chief of Domestic
Security; JAMES UTHMEIER, in his official
capacity as Florida Attorney General; BLAISE
INGOGLIA, in his official capacity as Florida
Chief Financial Officer; WILTON SIMPSON,
in his official capacity as Florida
Commissioner of Agriculture; GINGER
BOWDEN MADDEN, in her official capacity
as State Attorney for the 1st Judicial Circuit;
JACK CAMPBELL, in his official capacity as
State Attorney for the 2nd Judicial Circuit;
JOHN DURRETT, in his official capacity as
State Attorney for the 3rd Judicial Circuit;
MELISSA NELSON, in her official capacity as
State Attorney for the 4th Judicial Circuit;
BILL GLADSON, in his official capacity as
State Attorney for the 5th Judicial Circuit;
BRUCE BARTLETT, in his official capacity as
State Attorney for the 6th Judicial Circuit; R.J.
LARIZZA, in his official capacity as State
Attorney for the 7th Judicial Circuit; BRIAN
KRAMER, in his official capacity as State
Attorney for the 8th Judicial Circuit,
MONIQUE WORRELL, in her official
capacity as State Attorney for the 9th Judicial
Circuit; BRIAN HAAS, in his official capacity
as State Attorney for the 10th Judicial Circuit;

Case No. 4:26-cv-315

1

KATHERINE FERNANDEZ RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit; ED BRODSKY, in his official capacity as State Attorney for the 12th Judicial Circuit; SUSAN LOPEZ, in her official capacity as State Attorney for the 13th Judicial Circuit; LARRY BASFORD, in his official capacity as State Attorney for the 14th Judicial Circuit; ALEXCIA COX, in her official capacity as State Attorney for the 15th Judicial Circuit; DENNIS WARD, in his official capacity as State Attorney for the 16th Judicial Circuit; HAROLD PRYOR, in his official capacity as State Attorney for the 17th Judicial Circuit; WILLIAM SCHEINER, in his official capacity as State Attorney for the 18th Judicial Circuit; THOMAS BAKKEDAHL, in his official capacity as State Attorney for the 19th Judicial Circuit; and AMIRA FOX, in her official capacity as State Attorney for the 20th Judicial Circuit,

    *Defendants.*

_____/

## COMPLAINT

1.    This lawsuit challenges Florida's unprecedented "domestic terrorist organization" designation regime. Enacted this year by HB 1471 and HB 1473, Florida's new regime gives state executive officials the unilateral power to designate any U.S. organization—including nonprofits engaged in First Amendment-protected advocacy—a "domestic terrorist organization," or "DTO." Designation immediately subjects the organization, its employees, and a wide range of others who associate

with it to severe criminal and civil penalties on the basis of nothing more than allegations.

2.      There are practically no safeguards. Florida officials may designate an organization without giving it meaningful notice or a meaningful opportunity to challenge the designation before a neutral decisionmaker. In effect, the state's new designation regime empowers Governor DeSantis, the Chief of Domestic Security, and the Cabinet to play judge, jury, and nonprofit executioner.

3.      The plaintiffs in this lawsuit are two U.S. nonprofits: CAIR, the largest Muslim civil rights organization in the country, and its state chapter, CAIR-Florida. Their shared mission, rooted in faith, is to help people understand Islam, protect civil rights, promote justice, and empower American Muslims. For decades, they have pursued this mission the same way as countless other nonprofits—by holding community events, publishing educational and advocacy materials, opining on government policies, petitioning elected officials, and providing legal advice and representation.

4.      Today, CAIR and CAIR-Florida are in peril. Florida officials imminently intend to designate CAIR as a DTO under the state's new statutory regime, and they have indicated that they also consider CAIR-Florida to be a "terrorist organization." The effects of designation on CAIR and CAIR-Florida will be immediate and debilitating. In Florida, their speech will be silenced, their doors

3

will be shut, and they will be branded with the stigma of one of society's most infamous labels.

5. The state's impending designation has no legitimate basis. CAIR and CAIR-Florida are ordinary faith-driven corporations, organized under the laws of Florida and the District of Columbia. They are not engaged in terrorist activity. They serve, and employ, Floridians.

6. To Governor DeSantis and other Florida officials, none of that matters. These Florida officials see CAIR and CAIR-Florida's faith-driven advocacy as a dangerous threat.

7. This is wrong. And Florida's new statutory designation scheme is unconstitutional. *See* Fla. Stat. §§ 617.1420, 775.30, 775.33, 775.34, 874.03, 943.03102 (with respect to provisions concerning "domestic terrorist organizations" and together with the related provisions in Section 823.05 and Chapter 874, the "DTO regime").[1] The Constitution protects CAIR and CAIR-Florida just as much as it protects any other U.S. organization.

8. Plaintiffs challenge the DTO regime under the First Amendment and the due process clause of the Fourteenth Amendment. They seek a declaration that the DTO regime is unconstitutional, and an injunction to halt its enforcement.

---

[1] All statutory citations are to the 2025 Florida Statutes as amended by Laws of Florida chs. 2026-28 (HB 1471) and 2026-29 (HB 1473).

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

10.      Venue is proper in this district under 28 U.S.C. § 1391 because at least one Defendant resides here and a substantial part of the events giving rise to the claims occurred here.

**PARTIES**

11.      Plaintiff CAIR-Foundation, Inc. ("CAIR" or "CAIR Foundation") is a District of Columbia nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Washington, D.C. CAIR's faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims. CAIR operates in Florida and nationwide.

12.      Plaintiff CAIR Florida, Inc. ("CAIR-Florida") is a Florida nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Tampa. CAIR-Florida is an affiliated chapter of CAIR and works to advance CAIR's mission through advocacy on legal, cultural, social, nonpartisan political, and civic issues of public concern to American Muslims.

13.      Defendant Ron DeSantis is the Governor of Florida. He is one of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102.

He is sued in his official capacity.

14.     Defendant Mark Glass is Florida's Chief of Domestic Security and the executive director of the Florida Department of Law Enforcement ("FDLE"). Glass is one of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102(1)(a)1, (2)–(5). He is sued in his official capacity.

15.     Defendants James Uthmeier, Blaise Ingoglia, and Wilton Simpson are Florida's Attorney General, Chief Financial Officer, and Commissioner of Agriculture, respectively. Together they constitute the Florida Cabinet and are some of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102(1)(a)1, (2)–(5). They are each sued in their official capacity (together, with Governor DeSantis and Defendant Glass, "State Executive Defendants"). Additionally, the Attorney General's Department of Legal Affairs, through the Office of Statewide Prosecution within it, has the power to investigate and bring criminal charges under the DTO regime for alleged multi-circuit crimes. Fla. Const. Art. IV, § 4(b); Fla. Stat. § 16.56.

16.     Defendants Ginger Bowden Madden, Jack Campbell, John Durrett, Melissa Nelson, Bill Gladson, Bruce Bartlett, R.J. Larizza, Brian Kramer, Monique Worrell, Brian Haas, Katherine Fernandez Rundle, Ed Brodsky, Susan Lopez, Larry Basford, Alexcia Cox, Dennis Ward, Harold Pryor, William Scheiner, Thomas Bakkedahl, and Amira Fox are Florida's twenty state attorneys (together, "State

Attorney Defendants"). In those roles, they are each responsible for investigating and bringing criminal charges against persons under Florida's DTO regime. Fla. Stat. §§ 775.30, 775.32–.34, 823.05, 874.01, *et seq.* They are each sued in their official capacity.

## FACTUAL BACKGROUND

### I. Florida's Domestic Terrorist Organization Designation Regime

17. On April 6, 2026, Governor Ron DeSantis signed into law HB 1471 and HB 1473, sweeping legislation that establishes an unprecedented state "domestic terrorist organization" designation system. The legislation grants Florida's executive branch extraordinary authority to label and punish groups, including nonprofit organizations engaged in First Amendment-protected advocacy, that it unilaterally deems to be security threats. The laws became effective on July 1, 2026.

18. HB 1471 and HB 1473 create a regime under which the state's Chief of Domestic Security, Governor DeSantis, and the Florida Cabinet may designate groups as "domestic terrorist organizations," imposing a debilitating classification and stigma without meaningful notice or a meaningful opportunity to challenge the designation before a neutral decisionmaker. A panoply of state authorities can then immediately silence and incapacitate the designated group, its employees, its members, and a wide range of others associated with the group through extraordinarily broad and severe criminal, civil, and administrative penalties.

## A.    The State Designation Process

19.    Under the DTO regime, an organization may be designated as a "domestic terrorist organization" if the Chief of Domestic Security finds that it meets three criteria: (1) the organization is based or operates in Florida or anywhere else in the United States; (2) the organization "is engaging in terrorist activity, as defined in" Florida Statutes § 775.30; and (3) "[t]he terrorist activity of the organization is an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)1.[2]

20.    Florida Statutes § 775.30(1)(a) defines "terrorist activity" as any activity that involves either (a) "a violent act or an act dangerous to human life which is a violation of the criminal laws of [Florida] or of the United States" or (b) a violation of the Florida Computer Crimes Act, Fla. Stat. § 815.06, and that is intended to "[i]ntimidate, injure, or coerce a civilian population," "[i]nfluence the policy of a government by intimidation or coercion," or "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy."

---

[2] HB 1471 also allows the Chief of Domestic Security to designate entities as "foreign terrorist organizations" ("FTOs") if they have already been federally designated as an FTO "by the United States Secretary of State pursuant to § 219 of the Immigration and Nationality Act" and "[t]he terrorist activity of the organization is an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)2.

21.     The Chief of Domestic Security must "provide written notice to the Governor and Cabinet of his or her intent to designate" a group as a terrorist organization. Fla. Stat. § 943.03102(2)(a). The written notice "must be accompanied by a summary of the basis for [the] designation." *Id.*

22.     The Governor and Cabinet may approve or reject the designation by majority vote no earlier than "7 days after receipt of" the notice from the Chief of Domestic Security. Fla. Stat. § 943.03102(2)(d).

23.     The State must also attempt to deliver the notice of intent to the organization being designated, but only if the organization has a readily discernable location and notice can be safely delivered. Fla. Stat. § 943.03102(2)(b). The DTO regime does not specify who determines whether the notice can safely be delivered or a deadline by when notice to the organization must be served. When the State does deliver notice, nothing in the statute prevents the Chief of Domestic Security from delivering the notice shortly before the Governor and Cabinet vote.

24.     The DTO regime contains no meaningful pre-designation notice requirement, no evidentiary requirements, no standard of proof, and no requirement of a meaningful hearing before a neutral decisionmaker. It vests unbridled discretion in Florida's executive branch to punish, ostracize, and silence civil society organizations with which it disagrees, based on nothing more than allegations of wrongdoing.

25. In particular, the DTO regime contains no requirement that notice to the designated group include all the reasons for the designation and all the material evidence—inculpatory and exculpatory—that state decisionmakers may rely on to make or approve the designation. It does not require the State to prove or even provide evidence that the organization violated any law. It also does not specify any standard of proof to be applied in making the designation decision. Instead, the DTO regime states that the notice provided to the organization "need not" include even the "written findings" supporting the designation that must be provided to the Governor and Cabinet. *Id.* § 943.03102(2)(b)1.

26. The notice must state "the date, time, and location of any public meeting regarding the designation," and must "provide information on how to object to the designation or appeal a designation." *Id.* § 943.03102(2)(b)2–3. But the DTO regime does not require that "any public meeting" be held, or that any public meeting involve a meaningful opportunity for the group being designated to object to and challenge the designation before the Governor and Cabinet decide whether to approve it.

27. If the Governor and Cabinet choose to hold a public meeting, there is no requirement that the organization being designated receive all of the information that the State may be relying on. Although the DTO regime states that "meeting materials relating to the notice of intent" must be published in accordance with Fla.

Stat. § 120.525, it also explicitly vests unilateral discretion in the executive to restrict access to those materials on vague "state or national security" grounds, including under Florida's public records law. Fla. Stat. § 943.03102(2)(c), (g).

28. If the Governor and Cabinet approve a designation, the Chief of Domestic Security must publish notice of the designation in the Florida Administrative Register within seven days. Fla. Stat. § 943.03102(2)(e). The branding and designation of a domestic group as a "terrorist organization" is deemed effective upon publication in the Florida Administrative Register. Fla. Stat. § 775.30(1)(b). The Chief of Domestic Security also must "maintain and publish on [FDLE's] website a current list of organizations that" have been designated as DTOs. Fla. Stat. § 943.03102(1)(b).

29. After Florida officials publish the designation of the group as a "terrorist organization" in the Florida Administrative Register, the organization, or any member, may "challenge [its] designation in the circuit court of the Second Judicial Circuit in and for Leon County" within 30 days. Fla. Stat. § 943.03102(2)(f).

30. The statute's judicial review provision replicates the flaws of the executive designation process. It contains no requirement that both the designated group and the state court have access to all of the state's reasons for the terrorism designation and all the material evidence—inculpatory and exculpatory—that state decisionmakers relied on to make or approve the designation. Additionally, the state

11

court reviewing a designation challenge "may not compel the public disclosure of any document that is confidential or exempt under state law or that is confidential, restricted, or otherwise protected from public disclosure according to federal law." Fla. Stat. § 943.03102(2)(f).

31. The DTO regime does not specify what standard of review applies to the state court proceeding, which party bears the burden of proof, what procedures or rules apply to a designation challenge, or what evidence may be submitted by either the government or the designated party.

32. The DTO regime provides that a designated organization may petition FDLE "at any time, for the removal of [its] designation." Fla. Stat. § 943.03102(3)(a). Yet the statute fails to provide any procedures or criteria FDLE must use in considering such a petition, or on what grounds such a petition should be granted.

## B. The Draconian Consequences of Designation

33. In addition to the public stigma of being designated a "terrorist organization," the harms and consequences of designation under the DTO regime are severe. These consequences, which include harsh criminal and civil penalties for virtually any activity intended to further the group's mission or interests, impose punishment on the group *before* it even has the chance to challenge the factual and legal basis for its designation.

34. Immediately after a designation becomes effective, the designated organization—as well as its employees, officers, board members, and third parties—are subject to a staggering array of criminal, civil, and administrative penalties. In the case of a mission-driven nonprofit, these penalties effectively criminalize virtually all of the designated group's activities to advance its mission, including its speech. They also criminalize a wide array of third-party interactions with the designated group, which in turn limit the organization's ability to speak, to receive information, and to function. In short, the far-reaching and severe penalties make it impossible for the organization to continue operating.

35. Because the DTO regime imposes criminal and civil penalties for providing broadly-defined "material support" to a designated group, including a nonprofit, it may not employ directors or staff, coordinate or work with volunteers, receive or solicit donations, deposit or withdraw funds from its bank accounts, maintain or use social media accounts, retain legal counsel, lease or rent property or offices in Florida, receive telecommunications, internet, or utility services in Florida, or engage in any activity that is intended to further its organizational mission and interests. The DTO regime also imposes severe penalties under Florida's "criminal gang" statute, which subjects designated "domestic terrorist organizations" to civil and criminal liability simply for operating, effectively criminalizing their existence in Florida. As a result of the DTO regime, an organization that is designated simply

cannot function or exist in Florida in any meaningful sense.

36.    **Material Support.** The DTO regime makes it a first-degree felony, punishable by up to 30 years in prison, for any person to "knowingly provide[] material support or resources to a designated . . . domestic terrorist organization." Fla. Stat. § 775.33(3).[3]

37.    The term "material support or resources" is defined broadly to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, or transportation," but not "medicine or religious materials." Fla. Stat. § 775.33(1)(d).

38.    A person is deemed to provide "personnel" to a designated DTO if the person "knowingly provides" or "attempts" or "conspires" to provide "himself or herself or another person to" either "[w]ork under the direction and control of" the designated DTO or "[o]rganize, manage, supervise, or otherwise direct the

---

[3] The material support provision states that "[i]t is the intent of the Legislature that subsections (2) and (3)," including the prohibition on providing material support and resources to a designated DTO, "be interpreted in a manner consistent with federal case law interpreting 18 U.S.C. §§ 2339A and 2339B." Fla. Stat. § 775.33(7). Sections 2339A and 2339B prohibit persons from providing material support and resources to aid in the commission of certain specified crimes and to aid federally designated FTOs.

operations of" the designated DTO. Fla. Stat. § 775.33(5)(a).

39.    The term "expert advice or assistance" means "advice or assistance derived from scientific, technical, or other specialized knowledge." Fla. Stat. § 775.33(1)(c). The statute does not provide for any exception to this definition or specify that it does not apply to the provision of legal services or advice.

40.    The material support provision's "knowing" requirement is satisfied if, among other things, a person has mere "knowledge that the organization" "is a designated . . . domestic terrorist organization." Fla. Stat. § 775.33(3). There is no requirement of an intent to engage in criminal conduct.

41.    The statutory definition of "material support and resources" is extraordinarily broad. On its face, the material support provision threatens to punish:

    a.  Any designated organization's employees, officers, board members, and volunteers who serve as "personnel" to the designated organization or who provide it a "service" by engaging in work on the organization's behalf;

    b.  Any person, including members of the organization, or entity who donates or pays money to the designated organization, or who provides tangible goods to the designated organization (whether free or for payment);

    c.  Any person or entity providing any direct services to the designated organization, including banking, financial, administrative, professional, legal, management, communications, or advertising services;

    d.  Any person or entity providing a designated organization with indirect services, such as use of social media or speaking platforms or physical and digital data and information storage systems;

15

e. Any person or entity that rents or leases property to or from the designated organization;

f. Any person or entity who advises or provides specialized expert assistance, including legal, financial, or accounting assistance.

42. **Criminal Gang Prevention Act.** Under the DTO regime, a designated organization, such as a nonprofit, is also immediately deemed a "criminal gang" and thus subject to Florida's Criminal Gang Prevention Act (the "CGPA"). Fla. Stat. § 874.01, *et seq.*

43. The CGPA defines a "criminal gang" as "a formal or informal ongoing organization, association, or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols, including, but not limited to, terrorist organizations . . . ." Fla. Stat. § 874.03(1). It further defines "terrorist organizations" as including "[a] domestic terrorist organization whose designation as such has been published in the Florida Administrative Register in accordance with § 943.03102." *Id.* § 874.03(7)(a).

44. Florida's classification of a designated "terrorist organization" as a criminal gang under the CGPA immediately exposes the group and its employees to another layer of substantial criminal and civil penalties and immediate and irreparable harm.

45.    **The designated group and its employees and members are at immediate risk of criminal prosecution, with harsh penalties, for engaging in virtually any activity intended to further the organization's mission, even if that mission is lawful**. The CGPA makes it a felony, punishable by up to life in prison, if "any person" knowingly "initiates, organizes, plans, finances, directs, manages, or supervises criminal gang-related activity." Fla. Stat. § 874.10. Under Florida law, "[t]he word 'person' includes . . . corporations." Fla. Stat. § 1.01(3). The term "criminal gang-related activity" is defined broadly to include, among other things, any "activity committed with the intent to benefit promote or further the interests of a criminal gang." Fla. Stat. § 874.03(4)(a).

46.    The CGPA also makes it a felony of the third degree for "any person," "for the purpose of benefiting, promoting, or furthering the interests of" a DTO, to "use[] electronic communication . . . to advertise his or her presence in the community." Fla. Stat. § 874.11

47.    Relatedly, Florida Statutes § 775.34 makes it a second-degree felony to willfully become a "member" of a DTO who "serves under the direction or control of that organization with the intent to further the illegal acts of the organization." Given the breadth of "illegal acts" under the CGPA, this provision effectively criminalizes membership activity and service to a DTO, as members work to further the organization's and its employees' "initiat[ion]" of "criminal gang-related

17

activity." Fla. Stat. § 775.34.

48.     **The designated group is at immediate risk of real and personal property seizure and forfeiture.** Under the CGPA, "[a]ll profits, proceeds, and instrumentalities of criminal gang activity and all property used or intended or attempted to be used to facilitate the criminal activity of any criminal gang or of any criminal gang member; and all profits, proceeds, and instrumentalities of criminal gang recruitment and all property used or intended or attempted to be used to facilitate criminal gang recruitment are subject to seizure and forfeiture." Fla. Stat. § 874.08. Asset seizure and forfeiture are governed by the Florida Contraband Forfeiture Act. Fla. Stat. § 932.701, *et seq*. That Act authorizes immediate seizure of personal property and assets, and an organization whose assets have been seized may challenge the seizure only in a post-seizure hearing. Fla. Stat. § 932.703(3)(a)–(b).

49.     **The designated group is at immediate risk of Florida state and private litigation to prevent it from operating and fulfilling its organizational mission**. Criminal gangs are considered *per se* public nuisances under Florida's nuisance statute. Fla. Stat. § 823.05(2)(b)–(c). Under that statute, either the government or private individuals may sue to "abate[] or enjoin[]" the criminal gang and prevent it from any "use of a location" for purposes of engaging in "criminal-gang activity," which is broadly defined to include any activity that furthers a criminal gang's interests. *Id.*

50.     A designated group is also at immediate risk of civil liability for violating the far-reaching provisions of the CGPA. Fla. Stat. § 874.06(1), (2)(b) (authorizing the government and private actors to sue criminal gangs for CGPA violations).

51.     Under the DTO regime, designated groups, their employees, board members, volunteers, and others who associate with them face even further consequences, beyond the material support prohibitions and the CGPA.

52.     **Prohibition on State Contracts and Funding.** Once the designation of the domestic group has been published in the Florida Administrative Register, no "state agency, political subdivision, or public school district authorized to expend state-appropriated funds or levy ad valorem taxes" may "[e]xpend such funds or taxes to support a . . . domestic terrorist organization, or a member of such organization." Fla. Stat. § 943.03102(4)(a). Nor may any of these state and municipal entities "[c]ontract with . . . a domestic terrorist organization"; nor may they "[a]ccept any funds from a . . . domestic terrorist organization, or a member of such organization," with narrow exceptions. *Id.* § 943.03102(4)(b)–(c).

53.     **Dissolution.** The Florida Department of State "may commence" an administrative proceeding "to administratively dissolve" any corporation that "has been designated as a domestic terrorist organization," after "any timely judicial challenge . . . has been resolved." Fla. Stat. § 617.1420. A dissolved corporation

19

"may not conduct any affairs except that necessary to wind up," including liquidating or distributing its assets. Fla. Stat. § 617.1421(3).

54.     **Other Penalties for Supporting Designated Organizations.** In addition to the above penalties, Florida law imposes significant consequences on other third parties that engage in a broad range of other kinds of support to designated organizations, including students and advocacy groups. Among other things, Florida law prohibits certain private schools from contracting with people "affiliated with" a designated DTO, Fla. Stat. § 1002.421(1)(t), and restricts public school spending on activities that "[p]romote" any person or entity who has provided material support to a designated DTO, Fla. Stat. § 1003.035.

## II. CAIR and CAIR-Florida

55.     CAIR is the United States's largest Muslim civil rights and advocacy organization.[4] Its faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims through lawful advocacy and expressive activity protected by the First Amendment. CAIR pursues its mission nationwide, working in coordination with affiliate chapters in multiple states, including CAIR-Florida. CAIR has three employees who live in Florida and perform remote work for CAIR on national and interstate matters; all three work at the managerial or executive level. Two members

---

[4] CAIR was established in 2005. Its predecessor organization was founded in 1994.

of CAIR's Board also live in Florida, including the Board Chair. Both work remotely from Florida on CAIR Foundation matters, including matters relating to CAIR's work in Florida.

56.     CAIR-Florida is an affiliated chapter of CAIR. Like CAIR, CAIR-Florida's faith-driven mission is to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. In association with CAIR, CAIR-Florida engages in advocacy, education, and civic participation in Florida. CAIR-Florida operates statewide, with offices located in Tampa and Sunrise. It has six board members, all of whom are based in Florida; twelve staff members, eleven of whom are based in Florida; and four paid interns, all of whom are based in Florida. It also works with eight contractors, seven of whom are based in Florida, and two subcontractors, who are not based in Florida.

57.     CAIR and its more than 20 affiliated chapters, including CAIR-Florida, work to advance CAIR's mission through advocacy on legal, cultural, social, policy, and civic issues of public concern to American Muslims. In doing so, CAIR and CAIR-Florida seek to promote religious tolerance and understanding, cultural education, civil rights, and public policy that protects and enhances the equal treatment of Muslims in the United States. Their advocacy includes legal action in state and federal courts, and public policy advocacy, training, education, community organizing, interfaith commentary, and public commentary directed at federal, state

21

and local executive and legislative government officials and the public.

58.     CAIR and CAIR-Florida are active in furthering their mission throughout Florida and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence.

59.     As part of their public education and advocacy efforts, employees of CAIR and CAIR-Florida regularly appear on and are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern. These nonprofits regularly issue press releases and action alerts and hold press conferences as a part of their advocacy and in furtherance of their mission. In addition, Plaintiffs regularly post on social media outlets, like X, Instagram, and Facebook, to communicate with the public and with government officials as part of their advocacy efforts. Plaintiffs, through their employees, use electronic communications to let people know about their presence in the community as a resource for information and legal services. These nonprofits also regularly engage in meetings with local, state, and federal government officials, other organizations, civic groups, and religious institutions, and members of the public as part of their advocacy efforts. CAIR and CAIR-Florida engage in these activities in support of their advocacy efforts individually or jointly, and in some instances CAIR-Florida may do so alone but on behalf of itself and CAIR.

60.     CAIR and CAIR-Florida's staff and board members have chosen to

work for the organizations and serve on their boards, respectively, because they believe in, and wish to contribute to, the organizations' policy, religious, and civil rights advocacy, including through their provision of specialized skills and speech to the organizations.

### A.    CAIR's and CAIR-Florida's Faith-Based Speech and Advocacy

61.    In furtherance of their missions, CAIR and CAIR-Florida engage in speech to educate, empower, and defend Muslim Americans on matters of public concern.

62.    For example, CAIR and CAIR-Florida create and disseminate Know Your Rights materials for Muslims who face discrimination in the workplace and at elementary, secondary, and post-secondary schools. CAIR also creates and disseminates guides for Muslims who are traveling, and for those who are approached by law enforcement.

63.    CAIR-Florida visits mosques in Florida to educate Muslims about their rights.

64.    CAIR advocates for civil rights by providing legal representation and legal advocacy through its Legal Defense Fund. CAIR receives intakes and also represents clients from across the country, including from Florida, in litigation seeking to vindicate legal and constitutional rights. CAIR currently jointly represents several Florida residents alongside CAIR-Florida in litigation outside of Florida.

23

65.     CAIR-Florida provides a range of pro bono legal services to Florida residents, including those who have suffered government and workplace discrimination in violation of their civil rights and those navigating the immigration system. CAIR-Florida attorneys maintain a substantial immigration docket, representing clients in Miami and Orlando immigration courts as well as in interactions with U.S. Citizenship and Immigration Services. CAIR-Florida also represents multiple clients across several cases related to discrimination, including cases currently pending before the Equal Employment Opportunity Commission. In addition, CAIR-Florida jointly represents several Florida residents alongside CAIR in out-of-state proceedings.

66.     During Ramadan, the holiest and most important month of the year for Muslims, CAIR and CAIR-Florida create specialized programing that includes how to request accommodations at work and at school. CAIR-Florida also contacts Florida correctional facilities to remind them of their duty under federal and state law not to curtail the rights of Muslims in their custody.

67.     CAIR and CAIR-Florida empower and educate Muslims to be civically engaged through participation in the democratic process. CAIR hosts Muslim Hill Day at the U.S. Capitol, which brings Muslims from across the country, including from Florida, to engage in advocacy with their members of Congress. In 2026, representatives from CAIR-Florida participated in the event.

68.     CAIR-Florida hosts its own Muslim Day at the state Capitol in Tallahassee, Florida. CAIR-Florida's 2026 Muslim Day addressed issues such as free speech and legislation directly harming Muslim American communities; it culminated in the passage of House Resolution 8001, which celebrated the contributions of Florida's Muslim American community and recognized February 2026 as "Muslim American Heritage Month."

69.     CAIR and CAIR-Florida also encourage eligible American Muslims to register to vote and to exercise their right to vote through nonpartisan voter education and registration activities. For example, CAIR routinely participates in and supports National Muslim Voter Registration Day.

70.     CAIR and CAIR-Florida's advocacy and public education also include participation in interfaith organizations and associations. CAIR and CAIR-Florida engage with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to dispel and counter false stereotypes, prejudices, disinformation, and misinterpretations of Islamic tenets, including with respect to Sharia, which is frequently invoked in political discourse.

71.     As part of this work, CAIR and CAIR-Florida frequently counter disinformation about the nature of Sharia and its role in the lives of American Muslims. CAIR's public materials explain that Sharia is not a threat; instead, it is a moral and spiritual framework that guides Muslims' ordinary, personal exercise of

25

faith in furtherance of values like honesty, service, and community, which they share with other Americans. CAIR and CAIR-Florida note that Sharia requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws, and that it guides ordinary people toward honesty, service, and community.

72.    In 2025, CAIR and CAIR-Florida publicly opposed HB 119, commonly referred to as the "No Shari'a Act," much of which the Legislature eventually incorporated into HB 1471. CAIR-Florida publicly and sharply criticized Governor DeSantis's statements in support of the bill.

73.    CAIR and CAIR-Florida's advocacy, public education, community outreach, and civil rights work depend on their employees. They also rely on ongoing association, interaction, and coordination with other faith- and non-faith-based groups, businesses, and the public as an essential predicate to engaging in protected speech, association, and petitioning activity.

## B.    CAIR's and CAIR-Florida's Lawful Advocacy for Palestinian Human Rights

74.    In furtherance of their missions to promote civil rights and justice, CAIR and CAIR-Florida engage in public speech, expressive association, advocacy, and litigation in support of Palestinian human rights, and in defense of the First Amendment rights of individuals and organizations advocating for Palestinian

human rights.

75. For example, CAIR's and CAIR-Florida's work includes direct legal representation of, and advocacy for, Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, including by Governor DeSantis, based on their speech, association, and viewpoints in support of Palestinian human rights.

76. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP student organization at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-281 (N.D. Fla. 2023).

77. Beyond the SJP litigation, CAIR and CAIR-Florida have played a leading role in defending the civil rights of individuals and organizations advocating for Palestinian human rights, including by challenging governmental actions, institutional bans, and discriminatory enforcement arising from criticism of Israeli government conduct.

78. For example, CAIR and CAIR-Florida engaged in an advocacy campaign to bring back Mohammed Ibrahim—a 16-year-old U.S. citizen from Florida—who has been unjustly detained by Israel since February 2025. Part of the campaign included CAIR joining an August 2025 letter with more than 100 U.S.

27

faith-based, human rights, and civil rights organizations to U.S. Secretary of State Marco Rubio calling for diplomatic action to secure Mohammed's release.

79.    CAIR and CAIR-Florida also issued a March 2025 public statement condemning the Miami Beach mayor's effort to prevent a movie theater from showing an Oscar-winning Palestinian documentary based on its viewpoint.

80.    In April 2025, CAIR sent a letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers. CAIR also issued a February 2025 press release opposing President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and "own it."

81.    CAIR-Florida often petitions state officials through established legal processes to seek accountability for crimes targeting individuals based on their support for Palestinian human rights. For example, in March 2025, CAIR-Florida issued a press release and action alert urging Floridians to request that State Attorney Amira Fox pursue hate crime charges in connection with vandalism targeting pro-Palestine speech.

82.    CAIR and CAIR-Florida have condemned and publicly advocated against U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR and CAIR-Florida have also condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

28

### C.    CAIR and CAIR-Florida Do Not Engage in or Support Terrorist Activity

83.    Through public education and advocacy, CAIR and its affiliates, including CAIR-Florida, address and oppose narratives that portray Islam or American Muslims with false stereotypes, such as being inherently prone to violence, authoritarianism, religious intolerance, antisemitism, or extremism. Working in association with other faith-based and civil rights organizations, CAIR and CAIR-Florida strive to build a vibrant constitutional democracy where people of all religious traditions can thrive.

84.    CAIR and CAIR-Florida have never been charged with, let alone convicted of, a crime. Nor have CAIR or CAIR-Florida ever been designated by the federal government under its terrorism sanctions and designation regime.

85.    CAIR and CAIR-Florida do not engage in or support terrorist activity, as they have repeatedly stated. Indeed, ISIS, a federally designated Foreign Terrorist Organization, once threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

### III. State Executive Defendants Intend to Use the DTO Regime to Punish Organizations Whose Advocacy and Ideology They Disagree with, Including CAIR and CAIR-Florida.

86.    Florida officials, including Governor DeSantis and Cabinet members, have made clear that they intend to use the DTO regime to target and punish their perceived political enemies and those whose speech they disfavor, including U.S.

29

Muslims and organizations, such as CAIR and CAIR-Florida, that engage in civil rights advocacy on their behalf. They have specifically named CAIR as an entity that they intend to designate.

87. Governor DeSantis's and Cabinet members' hostility toward CAIR and CAIR-Florida's speech and advocacy has been public and persistent. Over the past several years, Florida officials have repeatedly attacked Muslim civil rights advocacy, including advocacy defending freedom of expression and religion. More recently, Governor DeSantis and Cabinet members have expressed increased hostility towards Muslim religious practices, falsely characterizing the Muslim religious tenets of Sharia as a threat. In fact, Sharia is not a unitary, codified legal system but a personal moral and spiritual framework that guides Muslims in their daily lives. By characterizing Sharia as a threat, Governor DeSantis and Cabinet members have made clear that observant Muslims and Muslim organizations, such as Plaintiffs, are not welcome in Florida.

88. Because CAIR and CAIR-Florida are not engaged in terrorist activity of any kind, the State Executive Defendants' only basis for designating CAIR and CAIR-Florida under the DTO regime is their hostility towards both organizations' religious missions and political advocacy. Governor DeSantis, the Chief of Domestic Security (who, as FDLE's executive director, is appointed by the Governor and

Cabinet and serves at their pleasure), and the Cabinet speak with one voice on this issue: they *will* make Plaintiffs' designation effective.

### A.    Governor DeSantis's and the Cabinet's Hostility Toward Islamic Religious Practices and Muslim Civil Rights Advocacy, Including Advocacy by CAIR and CAIR-Florida

89.    Since at least 2023, Florida officials, including Governor DeSantis and the Cabinet, have expressed hostility towards Islamic religious practices and Muslim civil rights advocacy. Plaintiffs' advocacy for Palestinian human rights, their speech explaining that Sharia is a moral and spiritual framework that is consistent with American values and countering disinformation about it, and their opposition to State efforts to restrict freedom of expression have placed Plaintiffs in direct and public conflict with Governor DeSantis and the Cabinet. Likewise, CAIR and CAIR-Florida's advocacy against Islamophobia and anti-Muslim discrimination have placed them in direct and public conflict with Governor DeSantis and Cabinet members, and positions they have taken regarding Muslim civil rights, religious freedom, and religious tolerance. Their hostility toward Plaintiffs' religious views, speech, and advocacy continues today.

### *Hostility to Palestinian Human Rights*

90.    In October 2023, Governor DeSantis publicly stated that the United States should not accept Palestinian refugees from Gaza because they were "all antisemitic." That same month, Florida officials issued a memorandum ordering the

31

deactivation of SJP chapters in the Florida State University System. The directive was issued by the Chancellor of the State University System in consultation with Governor DeSantis, who previously had publicly called for the student groups to be banned. As noted above, CAIR and CAIR-Florida brought a suit against Florida officials, including Governor DeSantis, challenging the directive as unconstitutional.

91. In November 2023, CFO Ingoglia, in his previous role as a state senator, introduced SB 470, a bill designed to strip postsecondary education benefits from students who were found to "promote[] a foreign terrorist organization." He introduced the bill in the wake of pro-Palestinian protests on Florida university campuses in 2023.

92. In January 2024, Governor DeSantis's presidential campaign website referred to his efforts to deactivate SJP chapters. Specifically, he stated that his administration had "directed Florida universities to enforce the law and terminate student chapters, such as National Students for Justice in Palestine (National SJP) . . . that support Hamas' terrorism." Consistent with these statements, Governor DeSantis publicly called for SJP chapters at Florida universities to be banned based on their expressive activity and viewpoints.

### *Hostility to Islam and to Plaintiffs' Speech about Islam and Sharia*

93. Florida officials, including Governor DeSantis and the Cabinet, have demonstrated hostility to Islam, to Plaintiffs' speech about Islam, and to Plaintiffs'

speech about Sharia in particular. CAIR's public materials explain that Sharia is not a threat; instead, it is a moral and spiritual framework that guides Muslims' ordinary, personal exercise of faith in furtherance of values like honesty, service, and community, which they share with other Americans. In its educational materials, CAIR explains that when Muslims pray to God five times a day, donate to charity, fast in Ramadan, or speak up against injustice, among many other practices, they are observing Sharia—just as Jews observe Halakha and Catholics abide by canon law. Yet Florida officials, including Governor DeSantis and the Cabinet, have sought to falsely portray Sharia as a dire threat to Floridians that must be suppressed.

94. In November 2023, during a nationally televised presidential debate, Governor DeSantis referred to efforts to combat Islamophobia as addressing "so-called Islamophobia" and stated that harassment of Muslims in the United States was not a real issue. That is false, as CAIR has explained in its public advocacy materials.

95. On October 8, 2025, in a post on X (formerly known as Twitter), Governor DeSantis endorsed HB 119 (the "No Shari'a Act"), which had been filed that same day. HB 119's sponsor, Representative Hillary Cassel (who also sponsored HB 1471 and HB 1473), stated that "Sharia law is incompatible with our values and our principles here in the United States."

96. On October 14, 2025, CAIR and CAIR-Florida in a joint press release publicly opposed the "No Shari'a Act" and Governor DeSantis's endorsement of it.

33

In that release, both organizations sharply criticized Governor DeSantis's support for the bill, including by characterizing HB 119 as a discriminatory and anti-Muslim measure, condemning Governor DeSantis's endorsement as harmful to religious freedom, and calling on Florida lawmakers and the public to reject the bill. The release expressly criticized Governor DeSantis personally and politically, challenged his priorities and leadership, and urged continued public opposition.[5]

97.    According to an October 27, 2025 Florida Phoenix article, all three members of the Cabinet—Attorney General Uthmeier, CFO Ingoglia, and Commissioner Simpson—questioned the legality of "steer[ing] taxpayer-funded scholarships to private Islamic schools that they contend undermine 'Western' values." Their criticisms rested on the schools' alleged connection to Sharia law. For example, Uthmeier stated that "Sharia law seeks to destroy and supplant the pillars of our republican form of government and is incompatible with the Western tradition." Simpson amplified Uthmeier's post on X. Ingoglia also announced that he was "looking into" a basis to conduct an audit against the schools.

98.    However, as Plaintiffs explain in their public advocacy, Governor DeSantis's and the Cabinet's assertions rest on false stereotypes about Islam and

---

[5] CAIR & CAIR-Florida Press Release (Oct. 14, 2025) (describing HB 119 as "disgraceful and bigoted," rooted in "lies, fearmongering, and political distraction," calling Governor DeSantis's endorsement "political cowardice and moral failure," and urging public opposition).

Sharia. In particular, Plaintiffs have emphasized that Sharia requires Muslims to comply with the laws of the country in which they reside.

99. On December 1, 2025, through a post on X, Governor DeSantis shared a Fox News article about the death of a Muslim woman in the Netherlands, which suggested that her family allegedly targeted her for not wearing a hijab (or headscarf). Governor DeSantis's comment accompanying the article was, "The wages of sharia…," despite the article itself not referencing Sharia. As CAIR has explained in its public educational materials, Islam does not allow honor killings.

100. In March 2026, as part of HB 1471, the Legislature passed a prohibition on the judicial application of religious law and what it refers to as Sharia law in particular. *See* Fla. Stat. § 2.05. No other religious law was identified by name in the bill, and Governor DeSantis publicly championed the legislation as an "anti-Sharia" law.

101. On April 6, 2026, at a press conference held after Governor DeSantis signed HB 1471, he stood behind a podium bearing a "no" symbol superimposed over the words "SHARIA LAW"—reflecting Islamophobia, hostility to Plaintiffs' views, and opposition to the values of religious freedom and tolerance advocated by Plaintiffs. Months earlier, on December 8, 2025, Governor DeSantis explicitly tied CAIR to a Sharia threat, saying that the Legislature was working "to stop the creep of Sharia law, and I hope that they codify these protections for Floridians against

35

CAIR and the Muslim Brotherhood in their legislation." On June 16, 2026, he described the bill as an "anti-Sharia bill . . . that allows law enforcement to identify and then we can ratify, the Governor and the Cabinet, designated terror organizations," such as the "Council of [sic] American Islamic Relations."

102. Attorney General Uthmeier has also made clear that practicing Muslims are not welcome in Florida. Appearing on Newsmax on April 8, 2026, Uthmeier said that he viewed HB 1471 as a response to "a surge of Muslims in this country that are pushing Sharia law, trying to influence our kids, and trying to educate the undermining of our republican ideals, trying to attack western civilization." Even if "we're not Dearborn, Michigan," he said—referring to the American city with the largest share of Muslim residents—"it's important here for us to always be proactive."

103. Governor DeSantis and the Cabinet have knowledge of, disagree with, disapprove of, and are hostile to Plaintiffs' religious views and advocacy for religious freedom and tolerance; Plaintiffs' efforts to educate the public on the meaning of Sharia and its compatibility with American values; Plaintiffs' pro-Palestinian political advocacy; and Plaintiffs' public expression and dissemination of those views through speech, association, and petitioning activity. Governor DeSantis and Cabinet members have further demonstrated this hostility through the promulgation of Executive Order 25-244, their endorsement of the DTO regime, and their related

36

statements targeting Plaintiffs' speech and advocacy, as discussed below. Those statements make clear that Governor DeSantis, the Chief of Domestic Security (who, as FDLE's executive director, is appointed by the Governor and Cabinet and serves at their pleasure), and the Cabinet speak with one voice on this issue: they *will* make Plaintiffs' designation effective.

### B.  Executive Order 25-244

104.  On December 8, 2025, Governor DeSantis issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations."

105.  In a post on X the same day, Governor DeSantis announced that "Florida is designating the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as foreign terrorist organizations. Florida agencies are hereby directed to undertake all lawful measures to prevent unlawful activities by these organizations, including denying privileges or resources to anyone providing material support."

106.  The Executive Order purported to designate CAIR as a "terrorist organization," as defined in Fla. Stat. § 874.03, and to impose sweeping consequences on CAIR and those who had provided it "material support."

107.  For example, the Executive Order prohibited CAIR, solely based on its supposed designation, from receiving any contract, employment, funds, or other benefit or privilege from any county or municipality, as well as all state executive

and cabinet agencies (except FDLE and the Florida Highway Patrol) and all the entities regulated by them. The Executive Order claimed to impose these restrictions not only on CAIR but also on any person "known to have provided material support or resources to" CAIR.

108.    The Executive Order cited four allegations as supposedly justifying its designation of CAIR: (1) CAIR was founded by the "Palestine Committee" in 1994; (2) in the words of unspecified "persons affiliated with CAIR," CAIR was "founded by persons connected to the Muslim Brotherhood" as "an official U.S. cover" to "conceal ties to Islamic extremist groups"; (3) CAIR was named as an unindicted coconspirator (but never charged) in a terrorism-financing case involving the Holy Land Foundation that concluded nearly two decades ago; and (4) "individuals associated with CAIR have been convicted of providing, and conspiring to provide, material support to designated terrorist organizations."

109.    The Executive Order failed to identify a single violent or dangerous act allegedly committed by CAIR.

110.    The Executive Order failed to acknowledge that CAIR has never been charged with or convicted of any crime, let alone one related to terrorism.

111.    The Executive Order failed to acknowledge that a federal court ruled that CAIR's public naming as an unindicted coconspirator in the Holy Land Foundation prosecution violated its Fifth Amendment rights because it was

38

"unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion" and "[n]either CAIR nor the other unindicted co-conspirators ha[d] been charged with a crime and" so "ha[d] no judicial forum in which to defend against the accusation." *United States v. Holy Land Found. for Relief & Dev.*, 2009 WL 10680203, at \*5 (N.D. Tex. July 1, 2009), *aff'd in part, rev'd in part on other grounds*, 624 F.3d 685 (5th Cir. 2010).

112. The Executive Order's purported justification for designating CAIR as a "terrorist organization" relies entirely on guilt-by-association allegations.

113. The Executive Order's purported designation of CAIR as a terrorist organization within the meaning of Fla. Stat. § 874.03 lacks a factual basis. CAIR has not engaged in and does not engage in "terrorism" or "terrorist activity."

114. The allegations asserted against CAIR in Executive Order 25-244 could not justify criminal charges, much less a criminal conviction, of any state or federal terrorism or terrorism-financing laws. Indeed, despite accusing CAIR of engaging in criminal conduct and falsely labeling it as a "terrorist organization," Defendants have not sought to charge CAIR with a crime—nor could they, in good faith.

115. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their constitutional rights under the First and Fourteenth Amendments. *CAIR-Found., Inc. v. DeSantis*, No. 4:25-cv-516

(N.D. Fla.). On March 4, 2026, the district court preliminarily enjoined enforcement of the Executive Order against CAIR, holding that CAIR was likely to succeed in establishing that the Executive Order impermissibly attempted to coerce third parties into suppressing CAIR's speech, in violation of the First Amendment. *CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1279 (N.D. Fla. 2026) ("Defendant [DeSantis]'s EO amounts to unconstitutional First Amendment coercion and Defendant has provided nothing to overcome the presumption of unconstitutionality.").

116. Governor DeSantis also has publicly revealed that, in addition to punishing CAIR and CAIR-Florida for their protected speech and advocacy, one of the purposes of the Executive Order was to obtain and access CAIR's financial records and internal information through discovery in a lawsuit by CAIR challenging the Executive Order. For example, after CAIR announced its intent to respond to the Executive Order, Governor DeSantis posted on X that "I look forward to discovery — especially the CAIR finances. Should be illuminating!"

117. On December 9, 2025, when asked by reporters about Plaintiffs' anticipated lawsuit, Governor DeSantis again stated that he welcomed the litigation not to defend the Executive Order's legality, but because it would allow the State to obtain CAIR's financial records through discovery. He repeatedly emphasized that CAIR's finances were, in his view, "really significant." He also asserted that "a lot

of it is financial" and expressed that a lawsuit would enable the State to "get a lot of information" it does not have and otherwise could not obtain.

118.   Governor DeSantis's public statements and actions confirm that the Executive Order was issued for retaliatory and improper purposes: to penalize Plaintiffs because he disapproves of the content and viewpoint of their religious and pro-Palestinian advocacy; to chill and deter constitutionally protected speech, association, and petitioning activity; to coerce third parties into suppressing Plaintiffs' advocacy by deterring them from associating or cooperating with Plaintiffs; to impair the exercise of Plaintiffs' other constitutional rights; and to attempt to justify intrusive government surveillance and investigation of Plaintiffs that would be otherwise improper and unavailable to Defendants and the State.

119.   Governor DeSantis's public statements and actions further establish that he has pre-judged the decision regarding CAIR and CAIR-Florida's designations under the DTO regime and intends to approve them.

### C.   The State Executive Defendants' Intent to Use the DTO Regime to Punish Plaintiffs for their Speech and Religious Advocacy

120.   On April 6, 2026—after the Executive Order was preliminarily enjoined as unconstitutional—Governor DeSantis signed HB 1471 and HB 1473 into law, establishing the DTO regime. Statements from legislators who supported the bills make clear that, in creating the DTO regime, the Legislature intended to endorse

Governor DeSantis's actions and Executive Order targeting Plaintiffs while adding a veneer of process and even harsher punishments. For example, Representative Cassel, the bills' sponsor, explained that she supported the Executive Order designating CAIR and the Muslim Brotherhood as terrorist organizations. HB 1471, in her view, would "create a due process"—albeit "not a judicial process"—"for these organizations" to be designated.[6] Similarly, Senator Erin Grall, the sponsor of the companion Senate bill, characterized it as "seek[ing] to bring a process" to Governor DeSantis's Executive Order designations.[7] Senator Grall also acknowledged that, in light of the preliminary injunction, "there's an open question about what our governor will be able to do through executive order."[8]

121.    In the weeks leading up to the passage of HB 1471 and HB 1473, and in the months afterward, Governor DeSantis's and Cabinet members' public statements demonstrate that they view the DTO regime's components as a means to target groups whose viewpoints they disfavor, including CAIR and CAIR-Florida.

122.    Governor DeSantis and Attorney General Uthmeier's public statements further confirm that they have pre-judged CAIR and CAIR-Florida as

---

[6] *Fla. H. Judiciary Comm.*, 2:28:55–29:16 (Feb. 26, 2026) (statement of Rep. Cassel) https://www.flhouse.gov/VideoPlayer.aspx?eventID=11180.

[7] *Fla. S. Judiciary Comm.*, 1:25:08–25:25 (Feb. 3, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6080.

[8] *Fla. S. Session*, 3:26:43–27:04 (Mar. 5, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6273.

"terrorist organizations" and intend to approve their designations.

123.    On December 8, 2025, the same day he signed the Executive Order, Governor DeSantis foreshadowed Florida's DTO regime, making clear that he intended it to reinforce his designation of CAIR under the Executive Order and tying the organization to a Sharia "threat." In a post on X, he remarked, "Members of the FL Legislature are crafting legislation to stop the creep of sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation."

124.    What Governor DeSantis did not publicly disclose is that, according to emails obtained by the Miami Herald, his office had produced the original draft of SB 1632, HB 1471's Senate companion, which proposed the creation of the DTO designation regime.

125.    In January 2026, through an X post, Florida Attorney General James Uthmeier put the city commission of Coral Springs, Florida, "on notice" that "state and local resources cannot be used by any organization affiliated with CAIR." Following Attorney General Uthmeier's post, the South Florida Muslim Federation dissociated from CAIR-Florida, which had been a member of the Federation since its inception. CAIR-Florida was unable to take part in the Federation's annual conference in Coral Springs, of which CAIR-Florida had been a sponsor. CAIR-

Florida employees were also forced to withdraw from planned participation in multiple conference panels.

126. On February 1, 2026, Uthmeier publicly commented on CAIR's designation under the Executive Order, posting: "In Florida, we take action! We will always oppose terrorist organizations. Thanks to [Governor DeSantis] for designating CAIR and the Muslim Brotherhood as foreign terrorist organizations under state law."

127. One day later, Uthmeier "requested law enforcement to be on heightened alert for any possible security threats" related to CAIR's appearance at Muslim Day at the Florida Capitol, an annual civic engagement event. He wrote on X: "CAIR, a designated foreign terrorist organization under state law, has called for a presence around the Florida Capitol today . . . [T]errorist organizations are barred from using any and all state resources, and we expect the governor's executive order to be upheld."

128. Even after the Executive Order was preliminarily enjoined, Governor DeSantis has continued to refer to CAIR publicly as a designated terrorist organization.

129. At Governor DeSantis's April 6, 2026, press conference on HB 1471, Governor DeSantis referenced CAIR's supposed designation as a foreign terrorist organization under the Executive Order and reiterated that "CAIR was an unindicted

44

coconspirator in the largest terror financing trial in American history, the Holy Land Foundation"—repeating the Executive Order's misleading justification for CAIR's designation. Governor DeSantis also suggested that CAIR's affiliates should not benefit from public funds: "If there's a school that's allied with CAIR, should you have any of your money going to things like that?"

130.    At the same event, Lieutenant Governor Jay Collins acknowledged that HB 1471 and 1473 are designed to discriminate on the basis of ideology: "[W]e will designate, defund, and dissolve people who don't stand for our values," Collins said. "To the ACLU, Equality Florida, CAIR and others who scream overreach because this law cuts off taxpayer cash to groups aligned with ideologies that are not commensurate or consistent with our Constitution and way of life, I hope you never have to hear screams of women, children and innocent."

131.    In an April 6, 2026, post on X announcing his signing of HB 1471, Governor DeSantis shared a graphic with the header, "BANNING SHARIA LAW." Underneath the header, the text identified CAIR's designation under the Executive Order as part of "Florida's record" on the issues the law was meant to advance. Reposting the graphic from his personal X account, Governor DeSantis echoed his December 9, 2025, post that anticipated legislative ratification of CAIR's designation: "We have a responsibility to defend and reinvigorate Western Civilization and that means protecting against creeping sharia in all its forms."

132.    During an April 7, 2026, interview with Sean Hannity on Fox News, Governor DeSantis described HB 1471 as a solution to "the broader issue of not allowing Islamist groups to get public money from things in Florida." He framed the purpose of the DTO regime as "identify[ing] groups that are supporting these [Islamist] organizations" so as not to spend "one cent for jihad."

133.    On April 8, 2026, Attorney General Uthmeier discussed HB 1471 during a Newsmax interview. As justification for the law, he stated, "[I]t's important here for us . . . to recognize that we do have a surge of Muslims in this country that are pushing sharia law, trying to influence our kids, and trying to educate the undermining of our republican ideals, trying to attack western civilization." With respect to the DTO regime, Attorney General Uthmeier claimed:

> We have heard reports of different Islamic groups working with foreign terrorist organizations and trying to build communities and infiltrate schools here in the state of Florida, especially in the Tampa area. . . . [W]e're going to investigate and where the state identifies that nonprofit groups and schools might be tied to terrorist organizations, we're going to shut down their opportunity to get many privileges here in the state of Florida.

134.    At an April 24, 2026, press conference discussing HB 1471 and 1473, Governor DeSantis affirmed that the bills will target and apply to CAIR. Governor DeSantis stated that he "had signed some very important legislation recently banning any imposition of Sharia law," and "we're not doing that—no use of state funds to go to any entity that is affiliated with groups like CAIR or the Muslim Brotherhood.

46

We have designated them as foreign terrorist organizations."

135.    On April 6, 2026, and again on June 16, 2026, Governor DeSantis publicly confirmed that he intended to ensure that CAIR would be designated once the DTO regime goes into effect on July 1, 2026. In June, he stated:

> I signed the . . . anti-Sharia bill earlier this year that allows law enforcement to identify and then we can ratify, the governor and cabinet, designated terror organizations. And so you have some of these like the Muslim Brotherhood, the Council of [sic] American Islamic Relations, like that, no doubt . . . we'll be doing that after July 1 when that legislation takes effect.

136.    As Governor DeSantis's statements make plain, he, the Chief of Domestic Security, and the Cabinet speak with one voice on this issue: they treat Plaintiffs as enemies on the basis of their protected speech and advocacy, conflate Plaintiffs with a Sharia "threat," and intend to designate Plaintiffs as domestic terrorist organizations now that the DTO regime has taken effect.

### IV. CAIR and CAIR-Florida's Impending Designation Under the DTO Regime

137.    On July 1, 2026, Governor DeSantis's office issued a press release in which he "announced the intent to designate" three "organizations" under HB 1471, including the "Council on American-Islamic Relations (CAIR)." "Upon confirmation by the Florida Cabinet," said the press release, "these designations will carry the full force of state law. State and local governments will be prohibited from providing taxpayer funding, contracts, or other public support to designated

47

organizations. Public colleges, universities, school districts, and other publicly funded institutions will be prohibited from using public resources to support or promote designated organizations. Organizations designated under Florida law may also be subject to dissolution as provided by statute, and individuals who knowingly provide material support or resources to designated organizations will face criminal penalties established under Florida law."

138.    That same day, Governor DeSantis held a press conference with other Florida executive officials regarding the DTO regime.

139.    During the press conference, Governor DeSantis noted that he had designated CAIR as a "terror organization" under the Executive Order. He then explained, referring to the DTO regime, "We did need to have more of a legal structure to be able to add teeth to these designations, and the Legislature responded, and I signed that legislation earlier this year." The purpose of the DTO regime, the Governor said, was to "prevent any creep of Sharia law" and "put the state on the offense against terrorist organizations," which "span a variety of ideologies."

140.    "We're going to move forward," Governor DeSantis said, "and we're going to make sure that we're very robust in doing this." He added, "My office and the Cabinet are poised to officially designate the first slew of terrorist organizations under the new law."

141.    The forthcoming designations, the Governor said, would constitute "a

reaffirmation of my prior executive order for the Muslim Brotherhood and the Council of [sic] American-Islamic Relations."

142. The Governor noted that designation under the DTO regime "requires ratification by the Cabinet," and he promised to "get that done very, very quickly." "We don't have a regularly scheduled cabinet meeting in July," said the Governor, "but I think we're going to be able to . . . jump on a call and do an emergency meeting to be able to ratify this, and then, you know, off to the races."

143. On July 1, 2026, at approximately 10 a.m., Plaintiffs' counsel contacted attorneys from the Florida Attorney General's Office who represent Governor DeSantis in the pending litigation over Executive Order 25-244. Plaintiffs' counsel asked that, if the government intended to issue a notice to designate CAIR or CAIR-Florida, that the notice be provided to counsel by email. As of the time of filing this complaint, Plaintiffs' counsel had not received a response to their request.

144. On July 1, 2026, at 2:48 p.m., Governor DeSantis posted a graphic on X. "Today," the graphic said, "Governor DeSantis announced the first terrorist organization designations under Florida law. The notices of intent include: Council on American-Islamic Relations (CAIR) . . . ."

145. In discovery in *CAIR-Foundation, Inc. v. DeSantis,* No. 4:25-cv-516-MW/MJF (filed December 15, 2025), Governor DeSantis admitted that he also considers CAIR-Florida a "terrorist organization." Accordingly, there is a substantial

risk that CAIR-Florida will imminently be designated as well, and there is a substantial risk that CAIR-Florida, its staff, board members, supporters, and other third parties will be subject to the DTO regime's array of criminal and civil penalties.

146.   Plaintiffs face a substantial risk that, when their designations are approved and become effective, the State Attorney Defendants and Office of Statewide Prosecution will seek to enforce the myriad criminal, civil, and administrative penalties under the DTO regime against Plaintiffs. For example, at the Governor's July 1 press conference, Brad McVay (Florida's statewide prosecutor) said, "We stand here committed to . . . prosecute any individual or group associated with terrorist activity."

147.   Designation will debilitate Plaintiffs' political advocacy, charitable giving, provision of legal services, and other organizational activity in Florida, including but not limited to their speech and association. For example:

   a. Immediately upon designation, Plaintiffs will be unable, within Florida, to further engage in transactions fundamental to their operations—*e.g.*, withdrawing funds from, and depositing funds in, bank accounts; renting office space; and organizing public events.

   b. Immediately upon designation, any employee, officer, or director of either Plaintiff who reports to work or otherwise knowingly contributes to either entity's operation, and who is subject to Florida's criminal jurisdiction, will face a substantial risk of severe criminal punishment under Florida law for providing "material support" to a "designated terrorist organization." Fla. Stat. § 775.33(3).

   c. Likewise, upon designation, Plaintiffs, any employee, officer, or

50

director of either Plaintiff, and any third party who knowingly "initiates, organizes, plans, finances, directs, manages, or supervises" activity with the intent to further Plaintiffs' interests, and is subject to Florida's criminal jurisdiction, will face a substantial risk of severe criminal punishment, including life in prison, under Florida's Criminal Gang Prevention Act. Fla. Stat. § 874.10.

d. Immediately upon designation, Plaintiffs will be unable, within Florida, to provide legal services and advice to members of their communities.

e. Immediately upon designation, persons or entities providing services to CAIR or CAIR-Florida—such as banks and other financial institutions; internet, telephone, and technology service providers (including email and data storage providers); vendors; retirement and other benefit administrators; accountants; financial advisors; and legal counsel—will face a substantial risk of severe criminal punishment under Florida law for providing "material support" to a "designated terrorist organization." Fla. Stat. § 775.33(3).

148. Designation will prevent CAIR-Florida from exercising the corporate powers conferred on not-for-profit organizations by Florida law. These include, among other things, the power to: "[m]ake contracts and guaranties"; "[c]onduct its affairs, carry on its operations, and have offices and exercise the powers granted by this act in any state, territory, district, or possession of the United States or any foreign country"; "[m]ake donations for the public welfare or for religious, charitable, scientific, educational, or other similar purposes"; and "exercise all powers necessary or convenient to effect any or all of the purposes for which the corporation is organized." Fla. Stat. § 617.0302.

149. Designation will significantly interfere with CAIR's exercise of the

51

corporate powers conferred on not-for-profit corporations under D.C. law, including, among other things, the power to "[c]onduct its activities, locate offices, and exercise the powers granted by this chapter within or without the District." D.C. Code § 29–403.02(10).

150.    Designation will, at minimum, substantially hinder Plaintiffs' attempts to seek judicial relief and clear their names.

    a.  The DTO regime (i) criminalizes the knowing provision of material support to designated organizations and (ii) does not expressly exempt the provision of legal services and advice to designated organizations seeking to pursue their rights and clear their names in federal or state court.

    b.  The DTO regime (i) criminalizes the knowing provision of material support to designated organizations and (ii) does not expressly exempt employees, directors, or other personnel who act on behalf of their organizations for the purpose of pursuing the organizations' rights and clearing their names in federal or state court—by, for example, providing sworn declarations or other factual testimony.

151.    CAIR and CAIR-Florida associate with one another and work together and independently to fulfill their mission by engaging in advocacy on cultural, social, nonpartisan political, and civic issues of public concern to American Muslims. This advocacy includes initiating and representing clients in litigation, engaging in public policy advocacy, conducting trainings, creating and publishing educational materials and hosting educational events, and leading community organizing efforts.

## CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the First Amendment—Right to Free Speech
### (in violation of 42 U.S.C. § 1983, against all Defendants)

152.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151.

153.   The First Amendment protects Plaintiffs' speech and advocacy on matters of public concern, including faith and religion, government affairs, civil rights, and public policy.

154.   The DTO regime is unlawful because it imposes an unconstitutional prior restraint. An organization designated as a DTO is immediately subject to severe restrictions on its speech—as well as its ability to receive speech from members, supporters, and others—before the speech occurs and before any judicial review.

155.   The DTO regime is unlawful because it vests unbridled and excessive discretion in the Chief of Domestic Security, the Governor, and the Cabinet to silence, debilitate, and blacklist domestic advocacy organizations engaged in First Amendment-protected activity, such as CAIR and CAIR-Florida, by designating them as "domestic terrorist organizations." The statute does not require that the designation be based on evidence; does not require State officials to satisfy any burden of proof; does not allow for review by a neutral decisionmaker prior to designation; and at no point requires disclosure of the State's evidence (if any) to the

53

designated organization.

156.    The DTO regime is unlawful because it is a substantially overbroad restriction on a designated organization's right to engage in and receive speech.

157.    The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful. By effectively shutting down CAIR-Florida and substantially impairing CAIR's ability to pursue its mission and engage in advocacy, designation suppresses Plaintiffs' speech to their supporters, to government, and to the public, and it suppresses speech from Plaintiffs' employees and other supporters, as set forth above.

158.    The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because Defendants' designation discriminates against Plaintiffs on the basis of their viewpoints, is not narrowly tailored, and does not actually advance a compelling government interest.

159.    The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because it directly suppresses Plaintiffs' speech and coerces third parties to unlawfully suppress Plaintiffs' speech, as set forth above.

160.    The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because it burdens Plaintiffs' right to receive information, and it does so on the basis of the content of that information. The DTO regime prevents people from providing, among other things, expert assistance in the form of speech

to CAIR and CAIR-Florida. These burdens are not narrowly tailored to actually advance a compelling state interest.

## COUNT TWO

### Violation of the First Amendment—Right to Association
### (in violation of 42 U.S.C. § 1983, against all Defendants)

161. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151.

162. The First Amendment guarantees freedom of association as an indispensable means of preserving other individual liberties. The right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion— constitutes expressive association and receives heightened constitutional protection.

163. In pursuing their faith-based mission, Plaintiffs' protected advocacy necessarily involves association, interaction, and coordination with each other, members of the public, and other organizations and businesses as an essential predicate to public education, interfaith work, and legal, civil rights, and public policy advocacy.

164. The DTO regime is unlawful because it vests unbridled and excessive discretion in the Chief of Domestic Security, the Governor, and the Cabinet to paralyze and debilitate the expressive associations of domestic advocacy organizations, such as CAIR and CAIR-Florida, by designating them as "domestic

55

terrorist organizations."

165.   The DTO regime is unlawful because it authorizes State Defendants to impair organizations' ability to engage in expressive association and advocacy, as set forth above. It does so both directly and indirectly, through the array of criminal, civil, and administrative penalties for individuals who associate with designated organizations in various respects. There is no substantial relationship between the DTO regime and a sufficiently important government interest, and the DTO regime is not narrowly tailored to achieve any such interest.

166.   The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because it profoundly impairs their ability to engage in expressive association and advocacy in Florida, as set forth above. It does so both directly and indirectly, through the array of criminal, civil, and administrative penalties for individuals who associate with Plaintiffs in various respects. There is no substantial relationship between the State Executive Defendants' designation of Plaintiffs and a sufficiently important government interest, and the designation under the DTO regime is not narrowly tailored to achieve any such interest.

## COUNT THREE

### Violation of the First Amendment—Retaliation
### (in violation of 42 U.S.C. § 1983, against all Defendants)

167.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151.

168.    The impending designation of Plaintiffs under the DTO regime is unlawful because it constitutes government retaliation against them in violation of the First Amendment.

169.    Plaintiffs' speech is constitutionally protected, as set forth above.

170.    The impending designation of Plaintiffs under the DTO regime is an adverse action that materially harms Plaintiffs, as set forth above. It would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

171.    Plaintiffs' protected speech and association are substantial or motivating factors in the State's challenged conduct, thus establishing a causal connection between the State's retaliatory actions and the protected activity, as set forth above.

## COUNT FOUR

### Violation of the First Amendment—Right to Petition
### (in violation of 42 U.S.C. § 1983, against all Defendants)

172.    Plaintiffs realleged and incorporate by reference the allegations in paragraphs 1 to 86 and 137 to 151.

173.    The First Amendment protects the right of the people to petition the government for a redress of grievances. The right to petition includes the ability of citizens and groups of them to approach the legislature, the executive branch, and the courts. The DTO regime and Plaintiffs' impending designation directly and indirectly substantially impairs Plaintiffs' right to petition, and is not narrowly

57

tailored to actually advance a compelling state interest, nor is there a substantial relationship between the impairment and a sufficiently important government interest.

## COUNT FIVE

**Violation of the Fourteenth Amendment—Procedural Due Process**
**(in violation of 42 U.S.C. § 1983, against all Defendants)**

174.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 86 and 137 to 151.

175.    The DTO regime violates the Fourteenth Amendment's guarantee of procedural due process as applied to domestic corporations, including nonprofits like Plaintiffs.

176.    Designation under the DTO regime deprives U.S. corporations, including Plaintiffs, of constitutionally protected interests in liberty and property, as set forth above.

177.    The procedures prescribed by the DTO regime, as set forth above, create an extraordinarily high risk that the state will erroneously deprive U.S. corporations, including Plaintiffs, of constitutionally protected interests in liberty and property.

178.    The State could feasibly provide significantly more robust procedural protections to U.S. corporations it seeks to designate, including Plaintiffs—and it has no legitimate interest in denying them such protections.

179. Consequently, the State's current procedures for designating U.S. organizations as "domestic terrorist organizations" are constitutionally inadequate; the DTO regime denies U.S. corporations, including Plaintiffs, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).

## COUNT SIX

### Violation of the Fourteenth Amendment—Right to Counsel
### (in violation of 42 U.S.C. § 1983, against all Defendants)

180. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 86 and 137 to 151.

181. The Fourteenth Amendment protects and guarantees litigants the right to retain and be represented by counsel in their legal proceedings, including the right to choose counsel free from arbitrary or unjustified governmental interference.

182. Plaintiffs' impending designation violates CAIR and CAIR-Florida's Fourteenth Amendment right to counsel.

183. Under the DTO regime, it is a felony, punishable by up to thirty years in prison, to provide any designated DTO with "material support or resources," which includes any "service" or "expert advice or assistance." Fla. Stat. § 775.33(1)(d). Further, it is a felony, punishable by up to life in prison, if any person knowingly "initiates, organizes, plans, finances, directs, manages, or supervises criminal gang-related activity." Fla. Stat. § 874.10.

184. The DTO regime does not exempt the provision of legal services, representation, and advice from these or any other prohibitions imposed under the DTO regime.

185. Once CAIR and CAIR-Florida's designations are approved and published in the Florida Administrative Register, any lawyer or legal organization that provides or attempts to provide legal services or representation to CAIR or CAIR-Florida faces a credible threat of criminal prosecution under the DTO regime, including under Fla. Stat. §§ 775.33(1)(d) and 874.10.

186. Because lawyers and legal organizations face a credible threat of prosecution for providing legal services or representation to CAIR and CAIR-Florida under the DTO regime, designation creates a substantial risk that CAIR and CAIR-Florida will be unable to obtain counsel to represent them in pending and future legal proceedings, including in future legal proceedings brought to challenge their designation under the DTO regime. Further, even where CAIR or CAIR-Florida can retain counsel, requiring them to proceed while their counsel face a credible threat of prosecution under the DTO regime itself causes CAIR and CAIR-Florida concrete harm.

187. CAIR and CAIR-Florida face a substantial risk that they will be denied their right to counsel under the Fourteenth Amendment and that this violation will cause CAIR and CAIR-Florida ongoing, irreparable harm.

## COUNT SEVEN

### Violation of the First Amendment—Right to Counsel
### (in violation of 42 U.S.C. § 1983, against all Defendants)

188.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151 above.

189.    The First Amendment protects and guarantees litigants the right to retain and associate with counsel in their legal proceedings and to petition the government for redress of grievances.

190.    Plaintiffs' impending designation violates CAIR and CAIR-Florida's First Amendment rights to retain and associate with counsel in their legal proceedings and to petition the government by exposing any person who provides CAIR or CAIR-Florida with legal services or representation to severe criminal penalties. Persons who provide legal services or representation to CAIR or CAIR-Florida face a credible threat that they will be prosecuted under the DTO regime, including under Fla. Stat. §§ 775.33(1)(d) and 874.10.

191.    Because lawyers and legal organizations face a credible threat of prosecution for providing legal services or representation to CAIR and CAIR-Florida under the DTO regime, designation creates a substantial risk that CAIR and CAIR-Florida will be unable to obtain counsel to represent them in pending and future legal proceedings, including in future legal proceedings brought to challenge their designation under the DTO regime. Further, even where CAIR or CAIR-Florida

can retain counsel, requiring them to proceed while their counsel face a credible threat of prosecution under the DTO regime itself causes CAIR and CAIR-Florida concrete harm.

192.    The DTO regime's restrictions on the ability of Plaintiffs to obtain legal services and representation violate the First Amendment because the State has no compelling or even legitimate interest in restricting Plaintiffs' access to counsel, and the restrictions not closely drawn or narrowly tailored to further any interest.

193.    CAIR and CAIR-Florida face a substantial risk that they will be denied their rights under the First Amendment and that this violation will cause CAIR and CAIR-Florida ongoing, irreparable harm.

**REQUEST FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

A.    Enjoin Defendants DeSantis, Glass, Uthmeier, Ingoglia, and Simpson from designating any group, including Plaintiffs, as "domestic terrorist organizations;" enjoin Defendant Glass from publishing the designation of any group, including Plaintiffs, as "domestic terrorist organizations" in the Florida Administrative Register; and enjoin all Defendants from otherwise taking steps to make any designation of "domestic terrorist organizations," including Plaintiffs' designation, effective.

B.  Enjoin all Defendants from enforcing any penalties against any group, including Plaintiffs, pursuant to their designation as DTOs under the DTO regime; and from enforcing any penalties against third parties in connection with the designation of any group, including Plaintiffs, under the DTO regime.

C.  Enjoin all Defendants from enforcing any prohibition on provision of legal services to or by Plaintiffs in connection with any civil or criminal proceedings involving Plaintiffs as a party or counsel, pursuant to their designation as DTOs under the DTO regime.

D.  Declare that the DTO regime and designation of Plaintiffs as DTOs pursuant to the DTO regime violates the First and Fourteenth Amendments.

E.  Award reasonable attorneys' fees and costs.

F.  Grant such other and further relief as the Court deems proper.

Respectfully submitted July 1, 2026,

/s/ *Daniel B. Tilley*

Scott D. McCoy (FBN 1004965)
**Southern Poverty Law Center**
2 South Biscayne Blvd., Ste. 3200
Miami, FL 33131
(786) 347-2056
scott.mccoy@splcenter.org

Hina Shamsi*
Ashley Gorski*
Charles Hogle*
Celin Carlo-Gonzalez*
Natalie Smith*
Patrick Toomey*
**American Civil Liberties Union Foundation**

63

Aaron S. Fleisher*
*Not licensed in DC*
**Southern Poverty Law Center**
1101 17th Street NW, Ste. 550
Washington, DC 20036
(202) 945-7904
aaron.fleisher@splcenter.org

Diego A. Soto*
**Southern Poverty Law Center**
150 E. Ponce De Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
diego.soto@splcenter.org

Mary Ella W. Simmons*
**Southern Poverty Law Center**
201 St. Charles Ave., Ste. 2000
New Orleans, LA 70170
(504) 486-8982
maryella.simmons@splcenter.org

Manoj S. "Sachin" Varghese*
Mark L. Bailey*
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com
bailey@bmelaw.com

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
agorski@aclu.org
charlie.hogle@aclu.org
ccarlo-gonzalez@aclu.org
n.smith@aclu.org
ptoomey@aclu.org

Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Shereef H. Akeel*
Samuel Simkins*
**Akeel & Valentine, PLC**
888 West Big Beaver Road, Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
sam@akeelvalentine.com

* *Pro hac vice motion forthcoming*

*Counsel for Plaintiffs*