**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-315-MW-MJF

RON DESANTIS, *et al.*,

*Defendants*.
_______________________________/

**PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE**

Plaintiffs CAIR-Foundation, Inc. ("CAIR") and CAIR-Florida, Inc. ("CAIR-Florida") submit this response to the Court's September 21, 2026 Order to Show Cause (ECF No. 64), which instructed the parties to brief whether this case should be dismissed for lack of standing under Article III.

This case should not be dismissed. Plaintiffs had standing when they filed this suit, and they have standing now. Governor Ron DeSantis announced on July 1, 2026, that he had received a notice of intent to designate Plaintiffs as "domestic terrorist organizations" under the new statutory scheme created by HB 1471 (the "DTO regime"). ECF No. 19-3 at 105–07 (Ex. 28). He stated publicly and repeatedly that he intended to move forward with voting on and approving Plaintiffs' designations "very, very quickly." *Id.* (Ex. 25 at 1:30–2:00). As Plaintiffs explained in their complaint, designation subjects Plaintiffs and those associated

with them—including their employees, board members, donors, volunteers, and supporters—to sweeping and unavoidable criminal sanctions. ECF No. 1 ("Compl.") ¶¶ 33–54. As of July 1, Plaintiffs' impending designation inflicted and threatened to inflict substantial harm, including requiring both organizations to shut down their operations in Florida entirely by as early as July 8.

The reason this case has not moved forward apace is that, after Governor DeSantis announced the first notice of intent and Plaintiffs filed their constitutional challenge, Defendants attempted to shore up the "process" for their impending designation of Plaintiffs. Defendant Glass and the Florida Department of Law Enforcement ("FDLE") stated that they intended to promulgate an emergency rule regarding the DTO regime's designation process. As described in further detail below, Defendant Glass and the FDLE took over two months to do so, waiting to publish the rule (Emergency Rule 11RER26-1) until September 11, 2026.

Now that they have issued the emergency rule, Defendants have again moved quickly to designate Plaintiffs under the new process. Defendant Glass issued a new notice of intent to designate Plaintiffs as "domestic terrorist organizations" on September 15, the earliest possible date Defendants could do so by agreement between the parties. The notice announced a public meeting for the Governor and Cabinet to consider the designation on September 29 (again, the earliest possible date), and directed Plaintiffs to submit any written objections to

their designation in advance. Defendants' counsel have represented that the Governor and Cabinet intend to vote on Plaintiffs' designation that day. Plaintiffs intend to amend their complaint after the vote.

Plaintiffs had standing on July 1, when the Governor announced that he had received a notice of intent to designate Plaintiffs as terrorist organizations and that he was "poised to officially designate the first slew of terrorist organizations under the new law," including "the Council of [sic] American Islamic Relations." ECF No. 19-3 (Ex. 25 at 2:00–26). They have standing now, as the vote on their designation is due to occur in less than a week.[1] This case should proceed to the merits.[2]

---

[1] Provided the case proceeds, Plaintiffs respectfully request a modification of the briefing schedule in light of the Court's understandable concern that the date the parties had requested for a decision does not leave the Court with enough time to appropriately adjudicate Plaintiffs' motion. *See* ECF No. 63 at 2. Plaintiffs now intend to move for a temporary restraining order (and not a preliminary injunction) within two days after the anticipated vote on September 29. Plaintiffs request that the Court order a new, shorter schedule for TRO briefing to provide the Court with sufficient time to rule on Plaintiffs' motion before designation becomes effective.

[2] Because of the severe harm Plaintiffs will face once their designations become effective, Plaintiffs respectfully ask that the Court direct Defendants to file their response to this submission by Friday, September 25, 2026, so that Plaintiffs may refile their lawsuit as soon as possible should the Court disagree that this case may proceed.

## BACKGROUND

### I. Governor DeSantis announced on July 1, 2026, that he received a notice of intent to designate Plaintiffs as domestic terrorist organizations.

On July 1, 2026, HB 1471's DTO regime" went into effect. Compl. ¶ 17. This law—which Governor DeSantis and the Executive Office of the Governor were heavily involved in creating and passing, *id.* ¶ 124—allows five executive officers to designate groups, including nonprofits, as "domestic terrorist organizations" and shut down their operations in the State of Florida with no meaningful process and in violation of the First Amendment. Under the DTO regime, the Chief of Domestic Security prepares a notice of intent to designate an organization and delivers it to the Governor and Florida Cabinet, who then vote on the designation. Fla. Stat. § 943.03102(2)(a)–(d). If the designation is approved, it is published in the Florida Administrative Register. Fla. Stat. § 943.03102(2)(e).

Designation triggers a host of draconian criminal prohibitions on virtually every interaction by or with the organization. *See, e.g.*, Fla. Stat. § 775.33(3) (prohibiting provision of "material support" to designated groups, including donating or serving as an employee to a group). Designated groups also are deemed "criminal gangs" under the Criminal Gang Prevention Act (the "CGPA"). Fla. Stat. § 874.03(1), (7)(a). The CGPA broadly criminalizes the knowing "initiation" of any activity (including speech) intended to further the interests of designated organizations; those who violate this prohibition face up to life in

prison. Fla. Stat. §§ 874.03(4), 874.10 (prohibiting persons from supervising, planning, financing, managing, or initiating any activity intended to further the interests of designated group).

The same day HB 1471 became effective, Governor DeSantis held a press conference to announce that he had received a notice of intent to designate CAIR as a domestic terrorist organization under the DTO regime. His announcement could not have made clearer that he and the Cabinet intended to vote on and approve Plaintiffs' designation as quickly as possible. His comments included the following:

- So, as part of that legislation, [the DTO regime] created a process for our state law enforcement to identify groups that can be given this designation. It requires ratification by the cabinet. *I don't think that's going to be an issue and we'll get that done very, very quickl*y, but the law takes effect on July 1st, today, and *so we are not going to waste any time.* We're going to move forward and we're going to make sure that we're very robust in doing this. ECF No. 19 (Ex. 25, at 1:30–2:00).

- Based on the recommendations of Florida's domestic security professionals and the authority, the newly established authority in law, *my office and the cabinet are poised to officially designate the first slew of terrorist organizations under the* [DTO regime]. That'll be a reaffirmation of my prior executive order for the Muslim Brotherhood and *the Council of American Islamic Relations*. *Id.* at 2:00–26.

- *When the cabinet does ratify these designations*, this is going to impact state and local governments in terms of providing funding to any organizations either directly or that are materially supporting these organizations. It will impact colleges and universities in the state of Florida. It will impact Florida's K-12 school choice scholarship program. *We're not sending scholarships to schools that are in*

*cahoots with groups like CAIR*. That is not gonna happen. *Id.* at 2:55–3:32.

- This is . . . what the people of Florida expected when I signed this law, and, again, *the law took effect today and we are moving forward today very strongly and resolutely*. *Id.* at 3:59–4:12.

- And so the way it works is, [the designation] needs to be ratified by the cabinet. There's a little window before the cabinet's able to do it. We don't have a regularly scheduled cabinet meeting in July but . . . I think *we're going to be able to . . . jump on a call and do an emergency meeting to be able to ratify this, and then, you know, off to the races*. *Id.* at 8:52–9:14.

Governor DeSantis's comments during the July 1 press conference were consistent with a press release his office issued on the same day.[3] *See, e.g.*, ECF No. 19-3 (Ex. 28 at 107) (July 1 press release announcing "the intent to designate" CAIR as a "domestic terrorist organization"). They were also consistent with comments made by Attorney General Uthmeier, who has at least twice publicly endorsed designation of CAIR as a "terrorist organization." Compl. ¶¶ 126–27.

The Governor and the three members of the Florida Cabinet intend to vote on Plaintiffs' designation on September 29.[4] As of July 1, it was already clear that at least Governor DeSantis and Attorney General Uthmeier intended to vote to designate Plaintiffs. Even in the unlikely event that the two other cabinet members

---

[3] *See also* Compl. ¶¶ at 89–119 (discussing Governor DeSantis's conflation of CAIR with a "Sharia" threat and Cabinet members' remarks about Sharia).

[4] The Florida Cabinet is composed of Attorney General Uthmeier, Chief Financial Officer Blaise Ingoglia, and Commissioner of Agriculture Wilton Simpson. Compl. ¶ 15.

vote against designation, under the Florida Constitution, in the event of a tie between the Cabinet and Governor, "the side on which the governor voted shall be deemed to prevail." Fla. Const. art. IV, sec. 4(a). There was no doubt about the outcome of a vote in July and there is none now.

Governor DeSantis's comments further reflected an express continuation and "reaffirmation" of Executive Order 25-244, which the Governor issued in December 2025, and which purported to designate CAIR as a terrorist organization. ECF No. 19-3 (Ex. 25 at 2:00–26). This Court preliminarily enjoined the enforcement of Executive Order 25-244 as applied to CAIR on March 4, 2026. *CAIR-Foundation, Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1281 (N.D. Fla. Mar. 4, 2026).

## II. Plaintiffs filed a pre-enforcement suit on July 1 and sought to enjoin a vote on their designation to allow the Court time to address the constitutionality of their designation before it became effective.

In light of the severe penalties flowing from designation, Plaintiffs filed suit on July 1, following Governor DeSantis's press conference, and moved to enjoin Governor DeSantis and the Florida Cabinet on constitutional grounds from voting on Plaintiffs' designation.[5] In support of their motion, Plaintiffs introduced evidence establishing the substantial harm they would face if they were designated,

[5] Plaintiffs sued Governor DeSantis, the members of the Florida Cabinet, the Florida Chief of Domestic Security Mark Glass, and the state attorney of each judicial circuit.

as well as harms that they had already incurred in preparing to shut down their operations in Florida due to the threat of designation. ECF Nos. 19-1 ("Mitchell Decl."), 19-2 ("Ruiz Decl.").

Because the DTO regime threatens up to life in prison for any person who works as a designated organization's employee, *see* Fla. Stat. §§ 775.33(3), 874.10, CAIR-Florida explained it had prepared to put all employees on leave and cease all operations indefinitely, Ruiz Decl. ¶¶ 40–41. CAIR attested it would have to do the same for its Florida-based employees and directors, including its Chief Operations Officer, Legal Operations Manager, Information Technology Director, and would have to ask its two Board members to recuse themselves from their roles, including the Board Chair. Mitchell Decl. ¶¶ 32–33, 48–52. This would substantially interfere with CAIR's work nationwide, as its Florida-based employees and board members are integral to CAIR's ability to function and operate. *Id.* Both organizations also confirmed that, if designated, they would have to cease all First Amendment advocacy and activity in the state. *Id.* ¶¶ 39–46; Ruiz Decl. ¶¶ 42–50.

Plaintiffs were also forced to divert substantial resources that would have otherwise been spent furthering their organizational missions to respond to and prepare for their impending designations. Plaintiffs are submitting with this response two supplemental declarations that describe these measures in greater detail. As Plaintiffs explain, given the threat of designation, there were several

measures that they were forced to take in advance of any vote on the designations, and these efforts diverted resources from other work to advance Plaintiffs' missions. Supplemental Declaration of Edward Mitchell ("Mitchell Supp. Decl.") ¶¶ 3–5; Supplemental Declaration of Wilfredo Ruiz ("Ruiz Supp. Decl.") ¶¶ 2–7, 10–13.

Shortly after Plaintiffs filed suit, and after the Court denied Plaintiffs' motion for emergency relief to give Defendants an opportunity to respond, ECF Nos. 26, 28, Defendants informed Plaintiffs that they intended to promulgate an emergency rule regarding the DTO regime and would delay moving forward with the designation process or acting on the notice of intent, ECF No. 33 at 2. It took Defendants two months to promulgate the rule, and they finally did so on September 11, 2026. Plaintiffs had no control over this process. Indeed, the substance of the rule, once issued, made clear that Defendants had used this time as an opportunity to respond to at least some of the arguments raised in Plaintiffs' motion. For example, the emergency rule included a provision clarifying that the FDLE would not consider certain legal services to fall within the scope of the DTO regime's prohibitions, *see* Emergency Rule 11RER26-1(5), a feature of the DTO regime that Plaintiffs had argued was unconstitutional, ECF No. 19 at 37–42; ECF No. 27.

In the interim, the parties have moved forward in litigating this case in earnest. As the Court directed, the parties negotiated a case schedule, and the Court implemented two case management orders setting deadlines for the parties to complete discovery and for trial. ECF Nos. 42, 61. Plaintiffs have begun serving discovery on Defendants and await Defendants' responses. ECF No. 55. Moreover, the parties have briefed, and the Court has ruled on, a motion to disqualify the Court from presiding over this case. ECF Nos. 50, 58, 60.

## III. The vote on Plaintiffs' designations is scheduled for September 29.

As soon as Florida officials adopted Emergency Rule 11RER26-1, Defendants moved quickly to implement the designation process. On September 15, the earliest possible day by agreement between the parties, *see* ECF No. 39, Defendants' counsel informed Plaintiffs that Florida Chief of Domestic Security Mark Glass had issued a new notice of intent to designate both CAIR and CAIR-Florida as domestic terrorist organizations. ECF No. 62 at 1. The notice directed Plaintiffs to submit written objections and scheduled a public meeting to vote on Plaintiffs' designation for September 29, 2026—again, the earliest possible day for the vote.

Because Governor DeSantis has made clear that he and the Cabinet will vote to approve Plaintiffs' designations, Plaintiffs intend to move quickly after the vote to ensure that the Court has sufficient time to rule on a motion seeking emergency

relief before Plaintiffs' designations go into effect. The risk of waiting is simply too high for two civil rights nonprofits working to serve and protect the rights of Florida residents. Once Plaintiffs' designations become effective, they will have to cease all operations in the state. CAIR-Florida will have to shut down entirely. *See* Ruiz Decl. ¶¶ 40–41. The harms both organizations will suffer if they have to wind down all Florida-based operations cannot be reversed easily, if at all. Mitchell Decl. ¶¶ 57–60; Ruiz Decl. ¶¶ 58–61.

## ARGUMENT

### I. Plaintiffs faced a credible threat of prosecution when they filed the Complaint, just as they do today.

Plaintiffs faced a credible threat of prosecution under Florida's DTO regime on July 1, when they filed the Complaint. What was true then is true now: as they did on July 1, Defendants intend to follow through on their public promises to designate Plaintiffs as "domestic terrorist organizations." After Plaintiffs filed the Complaint and moved for emergency relief, Defendants tapped the brakes a bit: they spent two months engaged in "emergency" rulemaking, assuring Plaintiffs that, in the meantime, their designations would not be published. But their march to designate Plaintiffs has pressed on, and it has never changed direction.

A plaintiff satisfies the injury-in-fact element of constitutional standing when (1) the plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2)

"there exists a credible threat of prosecution" under the statute. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979).

"[T]he credible threat of prosecution standard is," in the Eleventh Circuit's words, "quite forgiving." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (citation modified); *accord Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc); *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1177 (11th Cir. 2020); *see also Gale Force Roofing & Restoration, LLC v. Brown*, 548 F. Supp. 3d 1143, 1156 (N.D. Fla. 2021) (describing the "credible threat of prosecution standard" as "quite forgiving," and explaining that, to satisfy it, a plaintiff "need cross only a low threshold; the Supreme Court requires no more than a credible threat of prosecution, one that is not chimerical, or imaginary or speculative, [or] some reason for fearing prosecution.'" (quoting *Int'l Soc'y for Krishna Consciousness for Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979) (alterations in original)).

"Quite forgiving" means just that. "When a plaintiff challenges a law soon after it was enacted and the state vigorously defends the law in court," a court may "infer a credible threat of prosecution exists." *Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1242 (11th Cir. 2025) (citation modified); *accord Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023); *see also Harrell v. The Florida Bar*, 608 F.3d 1241, 1260 (11th Cir. 2010)

(holding that lawyer challenging state bar's attorney-advertising rules had satisfied the "credible threat of prosecution" standard because "there [was] at least some minimal probability that the challenged rules [would] be enforced if violated" (citation and footnote omitted)).

Plaintiffs readily clear the bar. Defendants have made no secret of their intent to designate Plaintiffs under Florida's new regime—before, on, and after the date the law went into effect. They have expressed that intent clearly and publicly. ECF No. 19-3 at 107 (Ex. 28), (Ex. 25 at 1:30–2:26, 2:55–3:32, 3:59–4:12, 8:52–9:14); Compl. ¶¶ 121–36. And on July 1—as soon as legally possible—the Chief of Domestic Security set the wheels in motion, transmitting a notice of intent to the Governor and Cabinet. The Governor then trumpeted the notice of intent through social media and press releases, presenting Plaintiffs' designations as a *fait accompli*. *E.g.*, Compl. ¶¶ 141–42, 144–45. If a threat has ever been credible, it is this one.

To be sure, before the severe criminal consequences of designation apply, the Governor and Cabinet must formalize Plaintiffs' designations by majority vote. Fla. Stat. § 943.03102(2)(d). But that requirement does not sap Plaintiffs' standing. That is so for at least three reasons, each of which is independently sufficient to get Plaintiffs through the courthouse door.

**First**, as a practical matter, Governor DeSantis, Defendant Glass (who, as FDLE's executive director, is appointed by the Governor and Cabinet), and the Cabinet speak with one voice on this issue: there is no serious question that they will make Plaintiffs' designation effective. *See, e.g.*, Compl. ¶¶ 121–136.

**Second**, Defendant Glass's transmittal of the first notice of intent, combined with the Governor's explicit public commitment to designating Plaintiffs, caused Plaintiffs to suffer cognizable injuries. As of July 1, Defendants' message was loud and clear: designation is impending. That message, conveyed repeatedly through official government channels, left Plaintiffs with no choice but to take immediate action to protect themselves, their personnel, and their community stakeholders from crushing civil and criminal liability. Mitchell Supp. Decl. ¶¶ 3–5; Ruiz Supp. Decl. ¶¶ 8–12. Not only did these actions divert resources from Plaintiffs' work to advance their missions, but HB 1471 also forced Plaintiffs to self-censor and limit their associations. These are injuries sufficient to confer standing.

Critically, Plaintiffs' injuries—as of July 1—were not contingent on the occurrence or result of the statutorily mandated vote. Instead, they flowed from the substantial risk of designation. In other words, like the "non-self-executing subpoena[s]" at issue in *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 192 (2026), the prospect of designation hung—and still hangs—like a sword of Damocles above Plaintiffs' heads. And just as Article III

did not require the plaintiff in *First Choice* to postpone its claims until after a court ordered it to comply with the subpoena, Article III does not require Plaintiffs to postpone their claims until after the Governor and Cabinet do what they have already promised to do: vote to approve the intended designation. After all, "the value of a sword of Damocles is that it hangs—not that it drops." *Id.* (citation modified).

More broadly, in the context of pre-enforcement challenges raising First Amendment claims, the Eleventh Circuit has held that "[t]he injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). The Eleventh Circuit has also held that "[l]itigants who are being 'chilled from engaging in constitutional activity' . . . suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction." *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015). Where the "operation" of a government policy "would cause a reasonable would-be speaker to self-censor," a plaintiff may establish standing—even where there is not a "direct prohibition against the exercise of First Amendment rights." *Speech First, Inc. v. Cartwright*, 32 F.4th

1110, 1120 (11th Cir. 2022) (cleaned up and citations omitted). Furthermore, government action that "'discourage[s]' people from associating with groups engaged in protected First Amendment advocacy" is "more than enough to establish injury in fact" for a First Amendment right of association claim. *First Choice*, 608 U.S. at 189 (citation modified).

Here, on July 1, Plaintiffs were not yet directly prohibited from speaking. But the "operation" of the DTO regime reasonably caused them to self-censor by cutting off protected associational relationships with donors, forgoing prospective legal clients, and limiting communications in Florida, among other injuries. *See* Mitchell Supp. Decl. ¶ 3 (stating that CAIR took steps by July 1 to restrict advocacy action communications, donor solicitations, and public and community outreach from being sent to Florida residents); Ruiz Supp. Decl. ¶¶ 7–12.

In addition, HB 1471 repeatedly forced Plaintiffs to divert resources from other organizational work, so that they could engage in contingency planning, ensure that they would be in compliance with the law, and respond to others' concerns about continuing to associate with them after HB 1471 went into effect. Mitchell Decl. ¶¶ 44–46; Mitchell Supp. Decl. ¶ 3; Ruiz Supp. Decl. ¶¶ 4–6. As the Eleventh Circuit has explained, "[l]osing time complying with a regulatory

burden" can constitute Article III injury. *Shen v. Commissioner of Fla. Dep't of Agriculture and Consumer Servs.*, 158 F.4th 1227, 1248 (11th Cir. 2025).[6]

**Third**, the Supreme Court has permitted plaintiffs to challenge government action even where there is some uncertainty as to whether, or how, the government will direct the action at the plaintiffs. The Court's opinion in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), is illustrative. There, the Court allowed a pre-enforcement First and Fourteenth Amendment challenge to proceed even though it was filed days before a state administrative body would vote to decide whether to refer the matter for prosecution.

The timeline of events in *SBA List* is telling. There, a pro-life advocacy organization issued a press release announcing its plan to publish election advertising critical of a congressman's vote. *Id*. at 153–54. In response, the congressman filed a complaint with the Ohio Elections Commission, alleging that claims in the press release violated a state prohibition on "false statement[s]

[6] *See id.* & n.3 (citing, *inter alia*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (finding standing where the harm was time wasted traveling to the county registrar's office); *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251–53 (11th Cir. 2015) (finding a concrete injury based on occupation of plaintiff's phone line and fax machine during the one-minute transmission of an unwanted fax); *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 293 (3d Cir. 2015) ("These requirements will in turn cause compliance costs for [plaintiff], a classic injury-in-fact." (citation omitted))).

concerning the voting record of a candidate or public official." *Id*. at 152–53. A Commission panel found probable cause of a violation and scheduled a hearing at which commissioners would vote on whether to refer the matter for prosecution. *Id*. at 153. "[A]fter the panel's probable-cause determination, but before the scheduled Commission hearing," the organization filed suit to enjoin the false statements law. *Id*. The Court held that the organization had demonstrated a "substantial" threat of prosecution sufficient to confer pre-enforcement standing. *Id*. at 164. This was so, the Court said, even though the suit was filed before the Commission had occasion to vote on whether the organization should be prosecuted.

As *SBA List* shows, a plaintiff may establish standing to bring a pre-enforcement challenge even where the relevant administrative body has not yet conducted a final vote to penalize the plaintiff. If that rule means anything, it means that Plaintiffs here had standing on July 1. On that date, the State Executive Defendants initiated an administrative process that placed instant burdens on Plaintiffs—not only by forcing them to take immediate steps to suspend their operations, *see* Mitchell Supp. Decl. ¶ 3; Ruiz Supp. Decl. ¶¶ 11–12, but by publicly branding them with ignominy. This administrative process was backed by repeated threats: Florida officials, including the Governor, made plain that they viewed it as a mere prelude to criminal enforcement. *See SBA List*, 573 U.S. at

165–66 (holding that burdensome administrative process that "may be viewed by the [public] as a sanction by the State," paired with the threat of enforcement, established standing); Compl. ¶¶ 142 (quoting statement of Governor at July 1 press conference: "[W]e're going to be able to . . . jump on a call and do an emergency meeting to be able to ratify this, and then, you know, off to the races"), 146 (quoting statement of Florida statewide prosecutor at July 1 press conference: "We stand here committed to . . . prosecute any individual or group associated with terrorist activity").

## II. The Court should grant Plaintiffs leave to cure any standing deficiencies in their amended complaint.

Even if Plaintiffs lacked standing to challenge their impending designations on July 1, they will undoubtedly have standing when the Governor and Cabinet vote to approve their designations in less than a week, on September 29. Accordingly, if the Court concludes that Plaintiffs lacked standing as of July 1, it should grant Plaintiffs leave to cure any standing deficiencies in their forthcoming amended complaint. *See* ECF No. 63 (ordering Plaintiffs to file an amended complaint on or before October 1).

Federal Rule of Civil Procedure 15(d) envisions precisely this scenario. Pursuant to that Rule, the Court may permit the filing of "a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented . . . even though the original pleading is defective in

stating a claim or defense." Fed. R. Civ. P. 15(d); *see also id.* advisory committee's note to 1963 amendment (noting that Rule 15(d) was adopted to avoid "needlessly remitt[ing] [plaintiffs] to the difficulties of commencing a new action even though events occurring after the commencement of the original action have made clear the right to relief"). The September 29 vote constitutes an "occurrence" or "event" that will remove all doubts as to Plaintiffs' standing to bring this lawsuit. Fed. R. Civ. P. 15(d). The Court should thus grant Plaintiffs leave to file "a supplemental pleading setting out" facts about the vote, which would cure an otherwise "defective" original pleading. *Id*.

The Supreme Court has long endorsed Rule 15(d)'s use in similar circumstances. In *Mathews v. Diaz*, the Court held that a "nonwaivable condition of jurisdiction," such as standing, may be "established" with facts alleged in a "supplemental complaint," even where those facts did not exist when the suit commenced. 426 U.S. 67, 75 & n.8 (1976) (citing Fed. R. Civ. P. 15(d)). Since then, courts of appeals across the country have explained that, pursuant to Rule 15(d), "a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint." *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (citing Fed. R. Civ. P. 15(d)); *see also Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 36 (1st Cir. 2020) (same); *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1044 (9th

Cir. 2015) (same); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008) (same); *Franks v. Ross*, 313 F.3d 184, 198–99 (4th Cir. 2002); *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 88 (2d Cir. 1992) (same). *But see S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (holding to contrary). District courts in this Circuit have followed the majority rule. *See, e.g.*, *Rendón v. Bloomberg, L.P.*, 2018 WL 11651981, at *6 (S.D. Fla. Sept. 13, 2018), *aff'd sub nom. Delgado v. Bloomberg L.P.*, 2019 WL 13491679 (S.D. Fla. May 10, 2019); *United Marine Mktg. Grp., LLC v. Jet Dock Sys., Inc.*, 2013 WL 12148864, at *5 (M.D. Fla. Mar. 6, 2013).[7]

The same rule should govern here. Accordingly, because Plaintiffs can cure any standing deficiencies in their forthcoming amended complaint, the Court should grant them leave to do so.

## CONCLUSION

For all these reasons, Plaintiffs have standing to proceed with the above-captioned matter.

---

[7] *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263 (11th Cir. 2003), is not to the contrary. There, the Eleventh Circuit held that facts alleged in a plaintiff's amended complaint supported standing because those facts related back to the date on which the plaintiff's original complaint was filed. *Id*. at 1275 (citing Fed. R. Civ. P. 15(c)(2)). That case did not address the question of whether Rule 15(d) permits plaintiffs to allege new facts demonstrating standing by supplementing a complaint. *Id*.

Respectfully submitted September 23, 2026,

Scott D. McCoy (FL Bar No. 1004965)
Aaron Fleisher (pro hac vice)
Diego Soto (pro hac vice)
Mary Ella W. Simmons (pro hac vice)
**Southern Poverty Law Center**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org
aaron.fleisher@splcenter.org
arthur.ago@splcenter.org
diego.soto@splcenter.org
maryella.simmons@splcenter.org

Manoj S. "Sachin" Varghese
(*pro hac vice*)
Mark L. Bailey (*pro hac vice*)
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com
bailey@bmelaw.com

*/s/ Hina Shamsi*

Hina Shamsi (*pro hac vice*)
Ashley Gorski (*pro hac vice*)
Charles Hogle (*pro hac vice*)
Celin Carlo-Gonzalez (*pro hac vice*)
Jeffrey Stein*
Natalie Smith (*pro hac vice*)
Patrick Toomey (*pro hac vice*)
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
agorski@aclu.org
charlie.hogle@aclu.org
ccarlo-gonzalez@aclu.org
jstein@aclu.org
n.smith@aclu.org
ptoomey@aclu.org

Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Shereef H. Akeel*
Samuel Simkins*
**Akeel & Valentine, PLC**
888 West Big Beaver Road, Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
sam@akeelvalentine.com

* *Pro hac vice motion forthcoming*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that counsel of record for Defendants have been served with this filing through the ECF filing system.

Dated: September 23, 2026

*/s/ Hina Shamsi*
Hina Shamsi
*Counsel for Plaintiffs*